UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 19-cv-2938 (SRN/LIB)

Lisa A. Biron,

       Plaintiff,

   v.

Kathleen Hawk Sawyer, Director Federal Bureau of
Prisons; Warden Nanette Barnes; Deanna Hiller,
Unit Manager,

       Defendants.

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION
TO DISMISS**

## INTRODUCTION

Defendants Kathleen Hawk Sawyer, Director, Federal Bureau of Prisons, Warden Nanette Barnes, and Deanna Hiller, Unit Manager, bring this Motion to Dismiss with respect to all claims against them asserted in Plaintiff Lisa A. Biron's Complaint. Doc. 1-2. Biron's Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because it fails to state a claim upon which relief may be granted. Biron's claims that Defendants improperly restrict her from contacting her daughter R.B., who is also the victim of her crime, are without merit and should be dismissed.

## BACKGROUND

According to Biron, Defendants are preventing her from communicating with R.B., who was the minor-victim in her crime. *See* Doc. 1-2, at 2. R.B. is now twenty-one years of age and asked Warden Barnes for permission to communicate with Biron. *See id.* However, Warden Barnes and Deanna Hiller have told her she may not have contact with

R.B. during her sentence. *See id.* Biron alleges this denial violates her right to a familial relationship, right of association, and due process of law. *See id.* Biron also seeks to join R.B. as a co-plaintiff. *See* Doc. 9.

The Warden of FCI Waseca is vested with discretion to determine who inmates may communicate with in the community. *See* Barnes Decl. ¶ 5. Wardens may place an inmate on restricted general correspondence as a matter of classification. *See id.* ¶ 6 & Ex. B at 10. Factors Wardens may consider in doing so are as follows:

> (1) Involvement in any of the activities listed in [28 C.F.R.] § 540.14(d);
> (2) Attempting to solicit funds or items (e.g., samples), or subscribing to a publication without paying for the subscription;
> (3) Being a security risk;
> (4) Threatening a government official; or
> (5) Having committed an offense involving the mail.

*See* Barnes Decl. ¶ 6 & Ex. B at 11. Section 540.14(d) permits the Warden to reject correspondence sent by an inmate "if it is determined detrimental to the security, good order, or discipline of the institution, to the protection of the public, or if it might facilitate criminal activity. *See* Barnes Decl. ¶ 6 & Ex. B at 9. Further, Wardens have similar discretion to limit inmates' telephone use when "necessary to ensure the security or good order, including discipline, of the institution or to protect the public." *See* Barnes Decl. ¶ 7; Barnes Ex. C at 1.

FCI Waseca houses inmates who have been convicted of sex offenses related to their children. *See* Barnes Decl. ¶ 8. Ordinarily, these perpetrator-inmates are precluded as an exercise of Warden Barnes' discretion under policy from having contact with their victim-children in order to protect the victim from being re-victimized. *See id.* If a victim-child

2

or their guardian contacts the institution and requests communication with the perpetrator-inmate, Warden Barnes will ask the inmate's Unit Manager to investigate whether any court has addressed the status of contact between the perpetrator-inmate and victim-child. *See id.* If courts have been silent on the issue, she will approve the communication based on the victim-child's request. *See id.* However, if a sentencing court or family court has spoken on the issue, she will follow the lead of that court as it was in the best position to balance the interests of the victim-child and perpetrator-inmate. *See id.* For example, if a sentencing court has prohibited contact between the perpetrator-inmate and victim-child as a condition of supervised release, Warden Barnes will implement that no-contact order during incarceration. *See id.* Or, if a family court indicates contact between the victim-child and perpetrator-inmate should be determined by an independent party, she will permit contact to the extent requested by that party. *See id.* Warden Barnes follows these procedures in order to be fair and consistent in her application of contact restrictions between inmate-perpetrators and their victim-children. *See id.*

Biron is serving a 480-month term of imprisonment for (1) Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C §§ 2423(a) and 2427; (2) Sexual Exploitation of Children, in violation of 18 U.S.C. §§ 2251(a) and 2256; and (3) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). *See* Barnes Decl. ¶ 3 & Ex. A. She has a projected release date of June 17, 2047, via a good conduct time release. *See id.*

Biron's criminal charges "were based on several videos and one photograph recovered from [her] computer that depict R.B. while engaged in sexually explicit conduct

with either Biron or one or two young men: Kevin Watson or Brandon Ore." *Biron v. United States*, No. 16-CV-108-PB, 2017 WL 4402394, *1 (D.N.H. Oct. 2, 2017). Regarding the first set of charges involving Watson, Biron and her daughter, R.B., met him on the internet and engaged in sexual activity with him via a webcam, almost daily. *See id.* Biron then travelled with R.B. to Buffalo, New York, and drove to Canada to pick Watson up. *See id.* The three stayed in a hotel room in Canada where they used alcohol and drugs. *See id.* Biron "insisted" R.B. and Watson have sex, and she filmed their encounter, commenting and laughing throughout the video. *See id.* Regarding the second set of charges of charges involving Ore, after meeting Biron through an advertisement on Craiglist, Ore eventually moved in with Biron and R.B. *See id.* at *2. Ore had a sexual relationship with R.B., which Biron "encouraged" and "supported." *See id.* Biron "suggested" that R.B. and Ore have sex in front of her, and Biron filmed it while conversing with Ore. *See id.* Finally, regarding Biron and R.B., Biron recorded videos of herself performing oral sex on R.B. *See id.* As part of her defense at trial, Biron argued that R.B. voluntarily engaged in the sexual contact captured on the videos, and therefore, Biron did not "cause" her to engage in it. *See id.* at *3.

As part of Biron's Judgment in a Criminal Case, her sentencing court imposed the following Special Condition of Supervision: "The defendant may not directly or indirectly contact the victim or any child under age 18; and, may not loiter within 100 yards of any school yard, playground, swimming pool, arcade, or other such place frequented by children." *See* Barnes Ex. D at 3. Throughout the sentencing hearing, the court

repeatedly expressed concern over Biron's victimization of R.B., the impact of that

victimization on R.B.'s thought process, and Biron's lack of remorse:

- "So, the victim here wrongly, and I think egregiously wrongly, has assumed a sense of guilt for the conduct that she has suffered at the hands of this defendant and has expressed a concern to the court . . . that she does not want the court to impose a life sentence." *See* Transcript of Sentencing Hearing, at 40-41, *United States v. Biron*, No. 12-cr-140-01-PB, Doc. 54 (D.N.H. May 23, 2013) (attached to the Declaration of Andrew Tweeten as Exhibit 1) (hereinafter "Transcript").

- "The goal is to see that hopefully she can get to the point of recognizing that she is 100 percent victim and this defendant is 100 percent perpetrator." *See* Transcript at 42.

- "But I think I should at least be mindful of how my sentence might impact that victim and to try to make some reasoned assessment about whether this sentence or that sentence might have some bearing on her, helping her come to the realization here that you have no reason to feel guilt for the victimization you have suffered." *See* Transcript at 43.

- Biron "used the victim as bait for her own personal sexual gratification. She used it as a way to lure young men into have sex with her, and by using her child as an object, an inhuman object to exploit so that she could pursue her interest in sexual gratification with young men." *See* Transcript at 47.

- "But what she did was embark on a pattern of conduct in which to satisfy her own interest in having sex with young men, she chose to use her vulnerable daughter and exploit her by engaging in – having her engage in sexual acts with other men and filming those acts in a way that used her to achieve an end for her, Ms. Biron, which is just sexual gratification. She wanted to have sex with young men and this was the way she figured out how she could do it, and she was willing to do what was necessary to achieve those ends." *See* Transcript at 53-54.

- "I guess I'm having trouble seeing why this isn't one of the worst possible variations of the crime given the betrayal of trust that was involved." *See* Transcript at 57.

- "You see, when being victimized by her mother under circumstances that leaves her feeling guilty for her own victimization, you get at the heart of what this crime is all about and why it is so egregiously wrong and why a just sentence calls for a very substantial period of incarceration. . . . It was that she was willing to use her daughter as an object to achieve sexual gratification for herself and committed these crimes to that end, in a way that betrayed a fundamental trust and left her daughter extraordinarily harmed and feeling guilty for her on [sic] victimization.   That's the harm."   *See* Transcript at 57-58.

- "One thing that is—that we haven't mentioned that in my mind was quite upsetting during the court of the trial were the defendant's recorded telephone calls at the prison in which it was suggesting, she was suggesting in those calls, again, trying to shift blame to her own daughter for the abuse that she inflicted on her daughter."   *See* Transcript at 63.

- "That attempt to shift blame even after she had been arrested and the existence of overwhelming evidence of her guilt, to continue to try to place blame on the victim for her own victimization of the child is really quite troubling to me."   *See* Transcript at 64.

- "This was part of a deep-seated pattern in which the defendant engaged in a number of carefully planned acts to, again, to pursue her own interest in sexual gratification through sex with young men by using her daughter as a lure to attract them and to have sex with them when she otherwise wouldn't have been able to attract them to have sex with them.   That seems to be what the case is primarily about."   *See* Transcript at 67.

- Speaking directly to Biron, "I think the damage that you have done to your daughter is incalculable.   I think the indifference that you showed her is shocking to me."   *See* Transcript at 70-71.

- "I'm not imposing a life sentence and I'm varying from that life sentence primarily for one reason.   And that is I believe that it's important that the victim in this case know that I have heard her.   In my view she has been so seriously harmed by her mother.   So seriously damaged.   She has so much work to do to recover from that victimization that we need to be sensitive to things that may aid in that process.   And I think, having watched this video, I think it's

important that she know that the judge heard her. She's at an age
where she feels that it's important to be heard. And I want her to
know that I heard her. Because I think that will be helpful to her in
her rehabilitation. Over time I hope she will come to see the truth,
which is that her mother is the victimizer and she is a completely
innocent victim. But I want right now to help her dealt with that
guilt, and I want her right now to know that I take her concerns
seriously, and to some extent I have tried to address those concerns."
*See* Transcript at 72.

Biron did not object to the special condition of supervision imposed by the sentencing

court. *See generally* Transcript. Nor did she appeal the special condition. *See* Brief for

Appellant, *United States v. Biron*, No. 13-1698 (1st Cir. May 28, 2014) (attached to the

Declaration of Andrew Tweeten as Exhibit 2); Judgment, *United States v. Biron*,

No. 13-1698 (1st Cir. Nov. 14, 2014) (attached to the Declaration of Andrew Tweeten as

Exhibit 3).

During the pendency of Biron's criminal case, the New Hampshire Department of

Health and Human Services' Division for Children, Youth and Families (DCYF) held a

"dispositional hearing" regarding Biron's parental rights regarding R.B. *See Biron v.

Upton*, No. 4:15-CV-205-P, 2020 WL 85146, *2 (N.D. Tex. Jan. 7, 2020). On

December 4, 2012, the 9th Circuit, Family Division Court of Manchester, New Hampshire,

found R.B. had suffered abuse. *Id.* That court ordered that Biron "shall not contact or

attempted to contact [R.B] either directly or indirectly" and "shall have no contact with

[R.B.] including third party contact except that as may be deemed appropriate by and

monitored by DCYF." *Id.*

Prior to Biron's transfer to FCI Waseca, she had been repeatedly disciplined for

attempts to communicate with R.B. while she was a minor. *See Biron v. Upton*,

Nos. 4:14-CV-772-O; 4:14-CV-823-O, 2015 WL 3603190, *1 (N.D. Tex. June 9, 2015), *aff'd*, 670 Fed. Appx. 869 (5th Cir. Nov. 23, 2016).   For example, while at FCI Danbury in Connecticut, Biron was found guilty of using a third-party to communicate with R.B. through the use of a code name.   *Id.* at *3.   Biron admitted that she sent the letter through the third-party even though she could have contact through DCYF because she did not what to be prevented from talking to her victim.   *See id.*

Although the Special Condition of Supervision prohibiting contact with R.B. applies during Biron's supervised release, the sentencing court's imposition of the condition was persuasive to Warden Barnes regarding the need to protect R.B. from contact by Biron. *See* Barnes Decl. ¶ 9.   On March 25, 2019, Warden Barnes re-approved a prior restriction prohibiting Biron from communicating with her daughter-victim, R.B.   *See* Barnes Decl. ¶ 10 & Ex. E.   She determined because R.B. was Biron's victim and the sentencing court believed contact between R.B. and Biron should be prohibited during Biron's supervised release, the prohibition was necessary to protect R.B. while Biron was incarcerated. *See* Barnes Decl. ¶ 10.

On October 31, 2019, Warden Barnes received correspondence from R.B. requesting contact with her mother.   *See* Barnes Decl. ¶ 11 & Ex. F.   R.B. indicated she was now 21 years of age.   *See* Barnes Decl. ¶ 11 & Ex. F at 3.   R.B.'s request to communicate indicated she no longer wanted to be protected from contact by Biron, but the Special Condition of Supervision remained.   *See* Barnes Decl. ¶ 12. The Special Condition could be interpreted as either prohibiting Biron from contacting the victim or other minors while under the age of 18 or as prohibiting Biron from all contact

with the victim regardless of the victim's age.  *See id.*   Warden Barnes therefore asked

her staff to seek clarification from the sentencing court before making a final decision

regarding communication between Biron and R.B.  *See id.*   The U.S. Probation Office

spoke with the sentencing court, and the sentencing court intended the Special Condition

to apply regardless of R.B.'s age.  *See id.*   Warden Barnes was also advised Biron would

need to file a motion with the court if she wanted the Special Condition to be modified.

*See id.*

Because the sentencing court intended to restrict Biron's supervised release contact

with R.B. regardless of R.B.'s age, the Special Condition was persuasive to Warden Barnes

regarding the continuing need to protect R.B. from contact by Biron.  *See* Barnes Decl.

¶ 13.  On November 20, 2019, Warden Barnes again approved a restriction prohibiting

Biron from communicating with her daughter-victim, R.B.  *See* Barnes Decl. ¶ 13 &

Ex. G.   Biron was advised of Warden Barnes' decision and willingness to reconsider if the

Special Condition was modified.   *See id.*

## ADMINISTRATIVE REMEDIES

## I.      The Bureau of Prisons' Administrative Remedy Procedures

The Bureau of Prisons has established an administrative remedy procedure whereby

inmates can seek formal review of any complaint regarding any aspect of their

imprisonment.   *See* 28 C.F.R. §§ 542.10-542.19.   In accordance with the BOP's

Administrative Remedy Program, an inmate shall first attempt informal resolution of his

complaint by presenting the issue informally to staff, and staff must attempt to resolve the

issue.   *See id.* § 542.13(a).   If the complaint cannot be resolved informally, the inmate

may submit a formal written Administrative Remedy Request to the Warden, on a designated form, within twenty days of the event that triggered the inmate's complaint. *See id.* § 542.14.   If the inmate's formal request is denied, the inmate may submit an appeal to the appropriate Regional Director of the BOP, within twenty calendar days of the date of the Warden signed the response.   *See id.* §542.15(a).   A negative decision from the Regional Director may in turn be appealed to the General Counsel's Office (in the Central Office) within thirty calendar days of the date the Regional Director signed the response. *See id.* § 542.15(a).   No administrative remedy appeal is considered to have been fully exhausted until considered by the Bureau of Prisons' Central Office.   *See* Bush Decl. ¶ 9.

Under certain circumstances, an inmate can bypass informal resolution and filing a Request for Administrative Remedy with the Warden.   *See* 28 C.F.R. § 542.14(d). The inmate may bypass the institution and file with the regional office when he appeals a Discipline Hearing Officer report, challenges a BOP decision not originating with the Warden, or reasonably believes the issue is sensitive and his safety or well-being would be placed in danger if his request became known at the institution.   *See id.* § 542.14(d)(1), (2), (5). Requests that do not meet the "sensitive" standard are not accepted, and the inmate is advised to pursue the request locally.   *See id.* § 542.14(d)(1).

## II.    Biron's Administrative Remedies

As of January 23, 2020, Biron has filed or attempted to file 116 administrative remedies with the Bureau of Prisons.   *See* Bush Decl. ¶ 14 & Ex. A.   Prior to the October 2019 request for communication, Biron filed Administrative Remedy 974777-F1 with the Warden, requesting correspondence and phone calls with her adult daughter.

*See* Bush Decl. ¶ 15 & Ex. A at 47; Ex. B.   The Warden responded, *see* Bush Decl. ¶ 15 &

Ex. A at 47, and Biron did not appeal that response, *see* Bush Decl. ¶ 15 & Ex. A.

On or about September 5, 2019, Biron filed Administrative Remedy 989892-F1,

challenging new mail procedures which had been implemented at FCI Waseca.

*See* Bush Decl. ¶ 16 & Ex. A at 51, Ex. C.   In her remedy, Biron did not raise the issue of

communication with her daughter.   *See* Bush Decl. ¶ 16 & Ex. C.   The Warden responded

to her remedy, *see* Bush Decl. ¶ 16 & Ex. A at 51, and Biron appealed the response to the

Regional Director, *see id.*   Biron then appealed the Regional Director's response to Central

Office, and her appeal was denied.   *See* Bush Decl. ¶ 16 & Ex. A at 53.

On or about November 6, 2019, Biron filed Administrative Remedy 996335-F1,

challenging an incident report she received for calling her daughter.   *See* Bush Decl. ¶ 17

& Ex. A at 52.   In her remedy, Biron claimed there were no court orders barring her from

communicating with her adult daughter, R.B., and therefore, her incident report should be

expunged.   *See* Bush Decl. ¶ 17 & Ex. D.   The Warden responded, *see* Bush Decl. ¶ 17 &

Ex. A at 52, and Biron appealed this response to the Regional Director, *see* Bush Decl. ¶ 17

& Ex. A at 55.   The Regional Director responded, *see id.*, and as of January 23, 2020, she

has not appealed to Central Office, *see* Bush Decl. ¶ 17; *see generally* Bush Exhibit A.

On or about December 9, 2019, Biron filed Administrative Remedy 999668-F1,

claiming she was entitled to communicate with her daughter due to ongoing, joint litigation.

*See* Bush Decl. ¶ 18 & Ex. A at 54; Ex. E.   Biron appealed the Warden's response to the

Regional Director, and as of January 23, 2020, the Regional Director's response was still

pending.   *See* Bush Decl. ¶ 18 & Ex. A at 59.

On or about December 9, 2019, Biron filed Administrative Remedy 999669-F1, challenging an incident report.   *See* Bush Decl., ¶ 19 & Ex. A at 54.   In this remedy, Biron again challenged discipline she received for writing her daughter.   *See* Bush Decl., ¶ 19 & Ex. F.   Biron appealed the Warden's response to the Regional Director, and as of January 23, 2020, the Regional Director's response was still pending.   *See* Bush Decl., ¶ 19 & Ex. A at 59.

## ARGUMENT

The Court should dismiss Biron's claims under Rule 12(b)(6).   To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 570 (2007)). Under this standard, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Twombly*, 550 U.S. at 555.   Thus, the Court must determine whether the plaintiff raises a plausible claim of entitlement to relief after assuming all factual allegations in the Second Amended Complaint to be true.   *Id.* at 558.   Legal assertions without further factual enhancement are not entitled to the presumption of truth on Defendants' Motion to Dismiss.   *See Iqbal*, 556 U.S. at 681.

## I.   Biron's Complaint Should Be Dismissed because she Failed to Exhaust Administrative Remedies.

The Prisoner Litigation Reform Act of 1995 ("PLRA") requires inmates to exhaust their administrative remedies before filing a claim regarding prison conditions:

> No action shall be brought with respect to prison conditions under [42 U.S.C.
> § 1983], or any other Federal law, by a prisoner confined in any jail, prison,
> or other correctional facility until such administrative remedies as are
> available are exhausted.

42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002).   The administrative process must be followed from start to finish.   *See Jones v. Bock*, 549 U.S. 199, 922-23 (2007) ("Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'   The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006) (explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits)" (citation omitted, emphasis in original)). An inmate must exhaust his administrative remedies even if the resolution, i.e., monetary damages, she seeks cannot be obtained from the administrative process. *S*ee *Booth v. Churner*, 532 U.S. 731, 741 (2001) ("Thus, we think that Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures.").

An inmate must exhaust administrative remedies as to each claim brought in a civil action.   *Cf. Jones*, 549 U.S. at 220-42. Some courts have engrafted "special circumstances" excusing administrative exhaustion under § 1997e(a) for "special circumstances":   "[T]here are certain 'special circumstances' in which, though administrative remedies may have been available[,] the prisoner's failure to comply with

administrative procedural requirements may nevertheless have been justified. In particular that was true when a prisoner 'reasonably'—even though mistakenly—'believed that he had sufficiently exhausted his remedies." *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1856 (2016) (internal quotations and citations omitted).   However, the Supreme Court unanimously rejected the special circumstances exceptions to mandatory exhaustion as inconsistent with the statutory language and legislative history of § 1997e(a). *Id.* at 1856-59; *see also Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000) ("Section 1997e(a) says nothing about a prisoner's subjective beliefs, logical or otherwise, about the administrative remedies that might be available to him.").[1]

If the inmate brings both exhausted and unexhausted claims, the court should dismiss the unexhausted claims and proceed on the exhausted claims. *See Chelette*, 229 F.3d at 688.   Administrative exhaustion is measured as of the time of filing the complaint, not when a court addresses the issue of exhaustion. *See Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003) ("Thus, in considering motions to dismiss for failure to exhaust under section 1997e(a), the district court must look to the time of filing, not the

---

[1]     The *Ross* Court however acknowledged that administrative remedies may not be "available" within the meaning of § 1997e(a) in three circumstances. *See* 136 S. Ct. at 1858-60.   First, an administrative remedy process may be unavailable if it is a "dead end—with offices unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859.   There must be some possibility of relief provided by the administrative remedy process. *See id.*   Second, an administrative process may be unavailable if the process is so complicated, "no ordinary prisoner can discern or navigate it." *Id*.   Third, an administrative process may not available "when prisoner administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860; *see also Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (noting an inmate cannot be required to exhaust administrative remedies when prison officials have prevented him from exhausting).

time the district court is rendering its decision, to determine if exhaustion has occurred. If exhaustion was not completed at the time of filing, dismissal is mandatory.").

Here, R.B.'s October 2019 letter changed the reasoning behind Warden Barnes' denial of communication, and Biron is required to exhaust her administrative remedies on the issue.  However, she has not done so.  Biron has begun the process of appealing discipline she received for contacting her daughter (Administrative Remedy Series 996335 and 999669) and the denial of communication despite being co-plaintiffs in this litigation (Administrative Remedy Series 999668), but she has not yet completed the process. Requiring exhaustion in this litigation will permit the BOP to develop an administrative record regarding its legitimate penological interests in prohibiting Biron from communicating with R.B., which in turn may aid this Court's analysis of the First Amendment issues.  This Complaint is therefore premature and must be dismissed. *See Johnson*, 340 F.3d at 627.

## II.   Biron Fails to State a Claim for Violation of Her Federal Constitutional Rights.

### A.   FCI Waseca's Restriction Preventing Biron from Communicating with R.B. Does Not Violate the First Amendment.

Biron alleges the denial of her right to communicate with R.B. violates her right to a familial relationship and association under the First Amendment.  By virtue of being incarcerated, inmates lose many privileges and rights.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Am. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 426 (8th Cir. 2007).  "In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that

are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.   Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law."   *Pell*, 417 U.S. at 822.

For these reasons, a prison policy that might restrict an otherwise recognized First Amendment right is valid if it is reasonably related to legitimate penological interests.[2]   *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987).   In considering whether this standard is met, courts must consider four factors: (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether inmates have an alternative means of exercising the right; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.   *Id.*   The burden is not

---

[2]    In the context of outgoing mail restrictions, a slightly different analysis applies. *See Procunier v. Martinez*, 416 U.S. 396, 414 (1974).   First, "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression"; the regulation must further "one or more substantial governmental interests of security, order, and rehabilitation.   *Id.*   Second, the limitation must be "no greater than is necessary or essential to the protection of the particular governmental interest involved."   *Id.*   Even under this heightened standard, the prohibition on Biron sending outgoing mail to R.B. is permissible.   The prohibition is intended to further the sentencing court's interest in protecting R.B. as the victim, which is unrelated to the content of the correspondence.   Because the sentencing court's Special Condition of Supervision prohibits all direct and indirect contact with R.B. regardless of her age, a complete prohibition on contact is the only way to further the governmental interest at stake.

on the Bureau to prove the validity of its actions, but on the inmate to disprove it. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

In weighing the first *Turner* factor, the Bureau of Prisons has a legitimate penological interest in being fair and consistent while managing contact between sex offenders and their children-victims, and there is a rational connection between this interest and Warden Barnes' decision to defer to courts, whether criminal or family courts, for balancing the interests of victim-children and perpetrator-inmates. To prevent disparity among these inmates, the Warden of FCI Waseca needs to be able to apply consistent guidelines without resorting to judgment calls on the moral appropriateness of communication between a perpetrator-inmate and her children-victims.

Further, as applied to Biron, a rational connection exists between the decision to prohibit Biron from communicating with R.B. and the legitimate governmental interest of respecting the sentencing court's determination regarding the need to protect R.B. from Biron. This is not a case where the Bureau is asking for the Court to defer to its determination R.B. needs to be protected from Biron, *cf. Overton*, 539 U.S. at 132 ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."); rather, the Bureau of Prisons is affording deference to the judgment of Biron's sentencing court. From the Bureau's perspective, Biron's sentencing court believed R.B. needed to be protected from Biron, and under 18 U.S.C. § 3583(d), imposed the Special Condition of Supervised Release restricting Biron from contacting R.B. regardless of her age. When

17

R.B.'s request to communicate with Biron was brought before the sentencing court, it stood by the Special Condition.   *See* Barnes Decl. ¶ 12.   Until the sentencing court indicates a retreat from the need to protect R.B. and amends the Special Condition of Supervised Release, the Bureau has a legitimate penological interest in enforcing the condition during Biron's incarceration.

The second *Turner* factor appears to weigh in Biron's favor: while Biron has alternative mean of communicating with the public, she is currently prohibited from contacting R.B., either directory or indirectly.   *Cf. Overton*, 529 U.S. at 135 ("Were it shown that no alternative means of communication existed, through it would not be conclusive, it would be some evidence that the regulations were unreasonable."). However, it is worth noting that all avenues of communication with R.B. are not necessarily precluded for the duration of Biron's incarceration because she can ask her sentencing court to revisit her Special Condition of Supervised Release.   If the court removes the condition, FCI Waseca will in turn revisit its prohibition.   *See* Barnes Decl. ¶ 13 & Ex. G.

The third *Turner* factor weighs in the Bureau's favor.   If Biron was permitted to communicate with R.B., the Bureau would need to divert resources away from monitoring of other inmates' correspondence and telephone calls, which already is a significant burden to staff.   *See* Barnes Decl. ¶¶ 14-17.   Further, monitoring of telephone calls could potentially be insufficient to protect R.B. because Biron could potentially harm R.B. before a live-monitored call was terminated.   *See* Barnes Decl. ¶ 17.   In addition, permitting Biron to communicate with R.B. creates disparity between Biron and other FCI Waseca inmates who are not permitted contact with their children-victims under similar

circumstances, and the Warden would potentially need to revisit those restrictions, which in turn, increases the need to monitor correspondence and telephone calls.

Finally, the fourth *Turner* factor favors the Bureau.   Biron has not offered any ready, easy-to-implement alternative; her request is an all-or-nothing request to communicate with R.B.   But, the Bureau has provided her a potential alternative through revisiting the issue with her sentencing court.   As of the date of this filing, she has not done so.   *See generally* Docket, *United States v. Biron*, No. 1:12-CR-00140-PB (D.N.H.).[3]

### B.   Biron's Due Process Rights Have Not Been Violated by Restrictions Preventing Her from Communicating with R.B.

Biron alleges her due process rights under the Fifth Amendment are violated by FCI Waseca's decision to prevent her from communicating with R.B.   *See* Doc. 1-2, at 2.   She does not allege whether her substantive or procedural due process rights have been violation, but she fails to state a claim under either standard.

As a preliminary matter, if Biron intends to raise a substantive due process claim, it must be dismissed as duplicative of her First Amendment claims.   The Supreme Court has held "that where a particular Amendment provides an explicit textual source of constitutional protections against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide

---

[3]       To the extent Biron aims to invalidate the special condition itself, such a challenge must be presented, if at all, to her sentencing court.   *See Abdallah v. Hedrick*, 392 F.3d 957, 959 (8th Cir. 2004); *Hill v. Morrison*, 349 F.3d 1089, 1091 (8th Cir. 2003); *Myrland v. United States*, No 13-cv-644 (PJS/TNL), 2013 WL 3280258, at *2 (D. Minn. June 27, 2013) ("a motion brought in the trial court under § 2255 is the exclusive remedy available to a federal prisoner who is asserting a collateral challenge to his conviction or sentence.").

for analyzing those claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citations and quotation omitted); *see also Stewart v. Wagner*, 836 F.3d 978, 983 (8th Cir. 2016). As Biron's claims can be analyzed under the First Amendment, the Court should decline to consider them under substantive due process.

The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. Assuming Biron has a protected liberty interest in communication with R.B., the question becomes what process is due. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Once it is determined that due process applies, the question remains what process is due."). The procedures to be afforded are flexible and require consideration of the interests at stake:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Here, Biron's procedural due process rights were not violated. Pre-deprivation process should not be required. While Biron may have a significant interest in communicating with R.B., the Bureau of Prisons has a significant interest in managing its inmate population and protecting the public. The decision to prohibit communication is based on the result of court proceedings, of which the inmate would have been a party and had knowledge. Additional pre-deprivation process would provide minimal value to the decision-making process.

Further, Biron has two avenues of post-deprivation remedies.  First, she was provided notice of the decision, the reasons supporting the decision, and her right to appeal through the Bureau's administrative remedy procedures.  *See* Barnes Ex. G.   Second, she can return to her sentencing court and ask to have the Special Condition of Supervised Release modified.  *See id.* & n.3 *supra*.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion and dismiss all claims against them with prejudice.

Dated:   February 4, 2020

ERICA H. MacDONALD
United States Attorney

*s/ Andrew Tweeten*

By:   ANDREW TWEETEN
Assistant United States Attorney
Attorney ID Number 0395190
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN   55415
(612) 664-5600
andrew.tweeten@usdoj.gov

Attorneys for Defendants